# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ERNESTO PUJOL-ALVAREZ, BARBARA CADENAS-GARCIA, <br><br>**Plaintiffs**, <br><br>v. <br><br>GRUPO HIMA-SAN PABLO, INC., *et al.*, <br><br>**Defendants**. | **Civil No.** 15-1746 (FAB) |

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court are two motions for summary judgment filed by defendants Centro Medico del Turabo, Inc., HIMA San Pablo-Bayamon, and HIMA San Pablo Captive Insurance LTD. (collectively, "HIMA"). (Docket Nos. 54 and 55.) For the reasons discussed below, the Court **GRANTS** defendants' motions.

## BACKGROUND

Plaintiffs, who are surviving family members of Ernesto Pujol-Rosquete ("Mr. Pujol"), filed suit against HIMA, Dr. Enrique Robles-Garcia ("Dr. Robles"),[1] and Dr. Myriam Perez-Pabon

---

[1] There is a Puerto Rico Medical Defense Insurance Company ("PRMDIC") policy issued in favor of Dr. Robles. (Docket No. 24 at p. 6.) Plaintiffs claim that PRMDIC could be liable for Dr. Robles' alleged malpractice. (Docket No. 24 at p. 6.)

("Dr. Perez"),[2] pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141-42.  (Docket No. 24.)  Plaintiffs claim that defendants' negligence, medical malpractice, and delayed treatment of Mr. Pujol's acute pancreatitis resulted in his death.  (Docket No. 24.)  Plaintiffs seek relief for emotional damages and for alleged EMTALA violations.  (Docket No. 24 at pp. 1-2.)

HIMA now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that EMTALA only creates a cause of action for the patient and not for the relatives of that patient, and that, in any event, no EMTALA violations occurred.  (Docket Nos. 54 and 55.)  HIMA urges the Court to decline to exercise supplemental jurisdiction over plaintiffs' Puerto Rico law claims.  (Docket No. 54 at p. 8.)  Plaintiffs opposed the motions, (Docket Nos. 61 and 64), and HIMA replied, (Docket Nos. 71 and 74).

## LEGAL STANDARD

A court will grant summary judgment if the moving party shows, based on materials in the record, "that there is no genuine dispute as to any material fact and [the moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute

---

[2] There is a SIMED insurance policy issued in favor of Dr. Perez. (Docket No. 24 at p. 6.)  Plaintiffs claim that SIMED could be liable for Dr. Perez's alleged malpractice. (Docket No. 24 at p. 6.)

is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 786 (1st Cir. 2011) (quoting Rodriguez-Rivera v. Federico Trilla Reg'l. Hosp. of Carolina, 532 F.3d 28, 30 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008).

At the summary judgment stage, a court must construe the entire record in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005). The court must refrain from making credibility determinations and weighing the evidence. See McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014). The Court also must disregard conclusory allegations and unsupported speculation. Id.

**DISCUSSION**

**I. EMTALA**

Plaintiffs allege that HIMA violated EMTALA by delaying Mr. Pujol's treatment, which led to his death. (Docket No. 24.) EMTALA requires covered hospitals to screen any visitor to a hospital emergency room for an emergency medical condition and to stabilize visitors suffering from an emergency condition prior transfer to another healthcare facility or discharge. 42 U.S.C.

§ 1395dd; see Correa v. Hosp. San Francisco, 69 F.3d 1188, 1198 (1st Cir. 1995).

> The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community . . . that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress.

Barber v. Hosp. Corp. of Am., 977 F.2d 873, 885 (4th Cir. 1992) (quoting 131 Cong. Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger)).  EMTALA does not create a federal cause of action for medical malpractice.  Correa, 69 F.3d at 1192.

In order to establish an EMTALA violation, the plaintiff must prove that:

> (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the [patient] arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if [he or] she had an emergency medical condition, or (b) released the patient without first stabilizing the emergency medical condition.

Id. at 1189 (citations omitted); see Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 717 F.3d 64, 69 (1st Cir. 2013).  The parties do not contest that HIMA is a participating EMTALA facility or that

Mr. Pujol arrived at the HIMA emergency room seeking medical treatment. (Docket Nos. 54, 55, 61, and 64.)

### A. Standing

Defendants argue that only patients have a cause of action under EMTALA, and that plaintiffs, who are family members of the patient, cannot pursue personal EMTALA claims against HIMA. (Docket No. 54.) In other words, defendants argue that plaintiffs lack standing. (Docket No. 54.)

The standing inquiry "focuses on whether the plaintiff is the proper party to bring this suit . . ." Raines v. Byrd, 521 U.S. 811, 818, 117. The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual cases and controversies. See U.S. Const. Art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.") An actual case or controversy exists when the "party seeking to invoke the court's jurisdiction (normally, the plaintiff) has a 'personal stake in the outcome' of the claim asserted." Pagan v. Calderon, 448 F.3d 16, 27 (1st Cir. 2006) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

To satisfy the personal stake requirement, "a plaintiff must establish each part of a familiar triad: injury, causation, and redressability." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st

Cir. 2012); see also Van Wagner Boston, LLC v. Davey, 770 F.3d 33, 36 (1st Cir. 2014) (quoting Lujan, 504 U.S. at 560-61) ("The 'irreducible constitutional minimum of standing' required that the plaintiff has suffered an injury in fact, that this injury was caused by the conduct complained of, and that the relief sought is likely to redress the injury suffered.")

EMTALA provides that "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located[.]" 42 U.S.C. § 1395dd(d)(2). The issue here is whether the term "any individual" applies to family members of a deceased patient. "The Senate Judiciary Committee stated that its intention was for EMTALA to authorize only two types of actions, to wit:  those brought by a medical facility which received an improperly transferred patient and those brought by the individual patient suffering the harm." Rios v. Hosp. HIMA San Pablo Fajardo, 126 F. Supp. 3d 237, 242 at 240 (D.P.R. 2015) (Fuste, J.). Accordingly, only medical facilities and patients have the right to bring a cause of action under EMTALA. Id. at p. 241.

In Correa, the First Circuit Court of Appeals recognized that a court "is equally open to read the law as permitting an

individual who has a special relationship with another . . . to sue when [he or] she is harmed in direct consequence of an EMTALA violation inflicted upon another[.]" Correa, 69 F.3d at 1196. Correa, however, "did not address if the relatives of a decedent have their own private cause of action under EMTALA. Instead, the scope of the holding in Correa is circumscribed to a situation where the heirs of a deceased patient inherit the decedent's EMTALA cause of action, a principle recognized in Puerto Rico law." Rios, 126 F. Supp. 3d at 241; see Correa, 69 F.3d at 1196; see also Alvarez-Pumajero v. Municipality of San Juan, 972 F. Supp. 86, 87-88 (D.P.R. 1997).

Here, plaintiffs only bring their personal claims for emotional damages suffered for Mr. Pujol's death. (Docket No. 24.) They do not allege that they inherited Mr. Pujol's own EMTALA cause of action. The Court finds that plaintiffs lack standing to bring their private causes of action pursuant EMTALA, and HIMA is entitled to judgment as a matter of law. Defendants' motion for summary judgment regarding plaintiffs' lack of standing is **GRANTED.**

**B. EMTALA Screening**

Out of an abundance of caution, the Court will also address defendants' alternative argument that the record is devoid of a genuine dispute over any fact material to their liability under EMTALA.

When a patient arrives at a hospital seeking treatment, EMTALA's screening provision requires that the hospital "provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). EMTALA does not define what an appropriate medical screening examination consists of, but the First Circuit Court of Appeals has held that a hospital meets its EMTALA screening duty if it (1) provides "an examination 'reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients,'" and (2) "'provides that level of screening uniformly to all those who present substantially similar complaints.'" Cruz-Vazquez, 717 F.3d at 69 (quoting Correa, 69 F.3d at 1192).

Regarding the first prong, plaintiffs do not allege that defendants' screening protocol is "not reasonably calculated to identify critical medical conditions." Rather, plaintiffs only allege that HIMA delayed treating the deceased, and that the delay was a departure from protocol. (Docket No. 24.) In other words, plaintiffs only allege a violation of the second prong established by Correa.

A hospital's screening protocols play a central role in its EMTALA screening duty. "When a hospital prescribes internal

procedures for a screening examination, those internal procedures set the parameters for an appropriate screening.'" Cruz-Queipo v. Hosp. Español Auxilio Mutuo de P.R., 417 F.3d 67, 70 (1st Cir. 2005) (quoting Correa, 69 F.3d at 1193). "Whether a hospital's existing screening protocol was followed in a circumstance where triggering symptoms were identified by hospital emergency room staff is thus a touchstone in gauging uniform treatment." Cruz-Vazquez, 717 F.3d 64, 70 (1st Cir. 2013); accord Correa, 69 F.3d at 1192 ("[A hospital's] refusal to follow regular screening procedures in a particular instance contravenes [EMTALA].") Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 558 (5th Cir. 2000) ("Evidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment.").

Here, by plaintiffs' own admission, Mr. Pujol arrived at the HIMA emergency room on June 3, 2014 at approximately 9:40 p.m. and was assisted by a nurse who marked his case as "urgent." (Docket No. 24 at p. 2.) Twenty minutes later, at approximately 10:00 p.m., Dr. Robles, the emergency room physician, evaluated Mr. Pujol and noted his chief complaint of "abdominal pain" (Docket No. 56-4.) Dr. Robles ordered various laboratory tests,[3] a CT

---

[3] Dr. Robles ordered a CBC, Basic Metabolic Panel, PT and PTT, and urinalysis. (Docket No. 56-5.)

scan, and treatment.[4] (Docket Nos. 56-4, 56-5, 56-6, and 56-7.) At 3:40 a.m., Dr. Robles reevaluated Mr. Pujol, ordered an increase in his IV fluids, and requested a consultation addressed to Dr. Perez.[5] (Docket Nos. 56-7, 56-8, 56-10.) Dr. Robles diagnosed Mr. Pujol with acute pancreatitis. (Docket No. 56-8.) Later, Dr. Perez evaluated Mr. Pujol, ordered additional laboratory tests, and admitted him for treatment under her care. (Docket Nos. 56-10 and 56-12.)

Plaintiffs admit that HIMA personnel correctly identified Mr. Pujol's urgent medical situation. (Docket No. 61 at p. 4.) Furthermore, plaintiffs' medical expert admits that Dr. Robles's evaluation of Mr. Pujol was timely, included a complete workup, and led to a proper diagnosis. (Docket No. 59-9 at p. 2.)

Based on those facts, HIMA provided a medical screening to Mr. Pujol that was reasonably calculated to diagnose his acute pancreatitis. Accordingly, the Court finds that there is no EMTALA screening violation.

---

[4] Dr. Robles prescribed morphine, Zofran, and IV Fluids. (Docket No. 56-7.)

[5] Originally, Dr. Robles requested a consultation from Dr. Martinez-Duran. (Docket No. 56-10.) Dr. Robles decided to consult Dr. Martinez-Duran via telephone. (Docket No. 56-8.) The consultation was also answered by Dr. Perez, who was the "on call" physician that evening. (Docket Nos. 56-10 and 56-11.)

### C.   **EMTALA Stabilization**

EMTALA requires covered hospitals to stabilize an individual if the hospital determines that the individual has an emergency medical condition. 42 U.S.C. § 1395dd(b)(1). Stabilization requires the provision of "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A). Transfer, in turn, means the movement of an individual outside the hospital (including discharge) at the direction of a hospital employee. 42 U.S.C. § 1395dd(e)(4). Thus, the stabilization requirement only applies to those individuals who, suffering from an emergency medical condition, are transferred (or discharged) from the treating hospital. See Alvarez-Torres v. Ryder Mem'l. Hosp., Inc., 582 F.3d 47, 52 (1st Cir. 2009).

The First Circuit Court of Appeals unequivocally has held that "a hospital cannot violate the [EMTALA] duty to stabilize unless it transfers a patient, as that procedure is defined in EMTALA." Alvarez-Torres, 582 F.3d at 51-53 (finding that "this interpretation is fully in keeping with the statutory intent, since transfer is where the danger of patient dumping often arises").

There is no allegation or fact in the record that the hospital transferred Mr. Pujol to another health care facility or

that he was discharged. In fact, the record reveals that Mr. Pujol did not leave the hospital once he arrived at the emergency room. Indeed, Dr. Perez admitted him to the hospital under her care. Thus, because no transfer or discharge occurred, plaintiffs cannot establish an EMTALA stabilization violation. See Alvarez-Torres, 582 F.3d at 51-53.

Plaintiffs also allege that Mr. Pujol was told by hospital personnel that he could not receive treatment because of his health insurance. (Docket No. 66 at p. 12.) This allegation is not properly supported, and plaintiffs do not provide the Court with evidence related to this allegation. As a consequence, it is waived.

There is no genuine dispute of any fact material to whether HIMA properly screened Mr. Pujol, nor is there any dispute that he was not transferred or discharged. Accordingly, HIMA's motion for summary judgment on plaintiff's EMTALA violation is **GRANTED**.

## II. Cause of Action Against Physicians

Plaintiffs bring their EMTALA claims not only against HIMA but also against the individual physicians. The civil enforcement provision of EMTALA, however, applies only to participating hospitals, not physicians. See 42 U.S.C. § 1395dd(d)(2)(A). This proposition finds abundant support in federal case law, including

from this district, although the First Circuit Court of Appeals has not pronounced itself on the issue. See Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1256 (9th Cir. 1995); King v. Ahrens, 16 F.3d 265, 271 (8th Cir. 1994); Delaney v. Cade, 986 F.2d 387, 393-94 (10th Cir. 1993); Baber, 977 F.2d at 878; Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1040 n. 1 (D.C. Cir. 1991); Millan v. Hosp. San Pablo, 389 F.Supp.2d 224, 235 (D.P.R. 2005); see also Negron Agosto, 299 F.3d at 19 ("we need not decide the question of physician liability in this case."). Accordingly, the Court holds that lack of a plaintiffs' lack a cause of action against the physicians (or their insurers) pursuant to EMTALA.

**III. Supplemental State law claims**

Because no federal claims remain on which to ground jurisdiction in this case, plaintiffs' supplemental state law claims against defendants are **DISMISSED without prejudice**.

### CONCLUSION

There are no facts that show defendants provided unreasonable care in screening Mr. Pujol or that defendants discharged or transferred him. For the reasons explained above, the Court **GRANTS** defendant HIMA's motions for summary judgment. Plaintiffs' EMTALA claims against all parties are **DISMISSED with prejudice**, leaving no remaining federal claims. The supplemental state law claims **are DISMISSED without prejudice**.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 13, 2017.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE
